**No. 24-2173**

### In the

# United States Court of Appeals

## For the Fourth Circuit

SAMUEL SHERBROOKE CORPORATE, LTD and SAMUEL GOLDNER,

*Plaintiffs-Appellants,*

v.

GABRIEL MAYER, ET AL.,

*Defendants-Appellees.*

On Appeal from the U.S. District Court for the Eastern District of North Carolina
Honorable Terrence W. Boyle
Case No. 5:24-cv-00057-BO-RJ

### OPENING BRIEF OF APPELLANTS

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
T: (919) 755-6688
F: (919) 755-6588
jellis@mcguirewoods.com

Brian A. Kahn
Zachary L. McCamey
Dylan M. Bensinger
Elisabeth P. Briand
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
T: (704) 343-2351
F: (704) 444-8869
bkahn@mcguirewoods.com

*Counsel for Appellants Samuel Sherbrooke
Corporate, LTD and Samuel Goldner*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 5:24cv57    Caption: Sherbrooke Corporate, Ltd., et al., v. Mayer, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sherbrooke Corporate, Ltd. and Samuel Goldner
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.   Does party/amicus have any parent corporations?  ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian A. Kahn _____      Date: ___December 6, 2024___

Counsel for: Sherbrooke Corporate, Ltd. and Samuel Goldner

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 3

STATEMENT OF ISSUES .................................................................... 3

STATEMENT OF THE CASE ................................................................ 4

I.     Factual Background ......................................................................... 4

      A.    Plaintiffs entrust day-to-day operations to Mayer, Walker, and Queen ....................................................................... 4

      B.    Mayer, Walker, and Queen manage Sherbrooke for their own gain ....................................................................... 5

      C.    Sherbrooke and Goldner discover Mayer, Walker, and Queen's malfeasance ..................................................... 6

      D.    Mayer, Walker, and Queen defy Sherbrooke's shareholders and board and prevent Plaintiffs' redress ................................................ 7

II.    Procedural History .......................................................................... 8

SUMMARY OF ARGUMENT ............................................................... 9

STANDARD OF REVIEW ................................................................... 11

ARGUMENT ..................................................................................... 11

I.     Plaintiffs Plausibly Alleged That They Took Reasonable Efforts To Maintain The Proprietary Software's Secrecy ......................... 12

      A.    Requiring employees to sign confidentiality agreements constitutes a reasonable effort to maintain secrecy ............................. 13

      B.    The trial court's reasoning to the contrary was flawed ...................... 15

           1.    Plaintiffs adequately alleged that Sherbrooke took commercially reasonable measures to keep the Proprietary Software secret .................................... 15

           2.    Plaintiffs adequately alleged that Sherbrooke treated the Proprietary Software as confidential information ................. 17

II.    Plaintiffs Plausibly Alleged That Defendants Misappropriated Plaintiffs' Proprietary Software .................................................. 22

i

A.  Plaintiffs alleged that Mayer, Walker, and Queen misappropriated the Proprietary Software under the DTSA ...........................................22

B.  The trial court granted Defendants' motion using the wrong pleading standard................................................................................23

III.  The Court Should Reverse The Trial Court's Refusal To Exercise Supplemental Jurisdiction Over Plaintiffs' State-Law Claims ....................26

CONCLUSION .................................................................................27

REQUEST FOR ORAL ARGUMENT ...................................................28

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Brightview Grp., LP v. Teeters,*
  441 F. Supp. 3d 115 (D. Md. 2020)............................................................ 16-17

*Burbach Broad. Co. of Del. v. Elkins Radio Corp.,*
  278 F.3d 401 (4th Cir. 2002) .......................................................................11

*Creamer v. Schwartz,*
  No. 2:16-CV-201, 2016 WL 5121812 (W.D. Pa. Sept. 21, 2016) ....................21

*dmarcian, Inc. v. dmarcian Eur. BV,*
  60 F.4th 119 (4th Cir. 2023) .......................................................................13

*Elgin Separation Sols., LLC v. Dillon,*
  No. 2:23-CV-00440, 2024 WL 3553850 (S.D.W. Va. July 25,
  2024) ..........................................................................................................15

*Feminist Majority Found. v. Hurley,*
  911 F.3d 674 (4th Cir. 2018) .......................................................................18

*Heska Corp. v. Qorvo US, Inc.,*
  No. 1:19CV1108, 2020 WL 5821078 (M.D.N.C. Sept. 30, 2020) .............. 24-25

*Hilb Grp. of New England, LLC v. Lavorgna,*
  No. 3:24-CV-462–HEH, 2024 WL 3234060 (E.D. Va. June 28,
  2024) ...................................................................................................14, 17

*MicroStrategy Inc, v. Bus. Objects, S.A.,*
  331 F. Supp. 2d 396 (E.D. Va. 2004) ...........................................................13

*Motor City Bagels, L.L.C. v. American Bagel Co.,*
  50 F. Supp. 2d 460 (D. Md. 1999).................................................................16

*NaturaLawn of America, Inc. v. West Group, LLC,*
  484 F. Supp. 2d 392 (D. Md. 2007)...............................................................16

*Paone v. Broadcom Corp.,*
  No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279 (E.D.N.Y. Aug.
  19, 2015) ....................................................................................................21

*Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*,
    932 F.3d 268 (4th Cir. 2019) ......................................................... 17-18

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Pilot Life
Ins. Co.*, No. C-90-29-G, 1991 WL 210855 (M.D.N.C. Aug. 6,
    1991) .................................................................................................21

*Tactical Rehab., Inc. v. Youssef*,
    No. 2:24-CV-173, 2024 WL 4712696 (E.D. Va. Nov. 7, 2024) .................. 14-15

*Trans-Radial Sols., LLC v. Burlington Med., LLC*,
    No. 2:18-CV-656, 2019 WL 3557879 (E.D. Va. Aug. 5, 2019) ........... 11-13, 17

*Vision Bank v. Tannin*, Inc.,
    No. CV 11-00051-CB-B, 2011 WL 13273499 (S.D. Ala. May 16,
    2011) .................................................................................................21

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
    386 F.3d 581 (4th Cir. 2004) ..................................................................4

*VRX USA, LLC v. VRX Ventures, Ltd.*,
    No. 3:20CV409-GCM, 2020 WL 7229672 (W.D.N.C. Dec. 8,
    2020) .................................................................................................24

*Williamson v. Prime Sports Mktg., LLC*,
    101 F.4th 302 (4th Cir. 2024) ................................................................11

*Witherspoon v. State Emps.' Credit Union*,
    733 F. Supp. 3d 446 (E.D.N.C. 2024) .....................................................11

*WWMAP, LLC v. Birth Your Way Midwifery*,
    711 F. Supp. 3d 1313 (N.D. Fla. 2024) ...................................................12

**Statutes**

18 U.S.C. § 1839(3)(A)-(B) ........................................................................13

18 U.S.C. § 1839(5)(B)(ii) ................................................................... 22-23

28 U.S.C. § 1331 ........................................................................................3

28 U.S.C. § 1367(c)(3) ..............................................................................26

Fed. R. Civ. P 8(a)(2) ...............................................................................24

## INTRODUCTION

Plaintiff Samuel Goldner and Defendants Gabriel Mayer, Beau Walker, and Joe Matthew Queen each served as directors or officers of Plaintiff Sherbrooke Corporate, Ltd., a captive insurance company that insures nursing facilities nationwide. Each Defendant signed an employment contract that prohibited the disclosure of Sherbrooke's confidential information and rendered any work product or inventions that Sherbrooke employees created the exclusive property of Sherbrooke.

Rather than abide by their contracts, Mayer, Walker, and Queen used their complete corporate control over Sherbrooke to siphon profits from Sherbrooke to themselves through self-dealing and the misappropriation of the company's assets and trade secrets. Most egregiously, during their time at Sherbrooke, the trio became familiar with certain confidential software that projected risk and priced insurance contracts more effectively than Sherbrooke's competitors (the "Proprietary Software"). They saw this software not as a competitive advantage for Sherbrooke, but as an opportunity for personal profit.

To capitalize, Mayer, Walker, and Queen founded another competing insurance company and used the Proprietary Software to help that company grow. When Goldner discovered Mayer, Walker, and Queen's misconduct, he immediately terminated them and attempted to end their control over, and access to, Sherbrooke.

Mayer, Walker, and Queen refused to accept Goldner's decision and wrongfully retained control over Sherbrooke's assets. This corporate coup left Plaintiffs with no choice but to sue to prevent any continued unlawful behavior.

But Mayer, Walker, and Queen's obstinance continues. Because they retain control over certain of Sherbrooke's assets, they control access to the records and documents that Plaintiffs need to prosecute their case. And they have sought to maximize that advantage by moving for judgment on the pleadings before they must produce those documents in discovery. Mayer, Walker, and Queen's gamesmanship paid off when the trial court granted their motion as to Plaintiffs' Defend Trade Secrets Act (DTSA) claim—their only federal claim—and declining to exercise supplemental jurisdiction over the remainder of Plaintiffs' case.

But the court erred. Contrary to the court's conclusions, the Proprietary Software is a trade secret under the DTSA because Plaintiff took reasonable efforts to maintain its secrecy by ensuring Sherbrooke employees agreed to safeguard its confidentiality. The court misinterpreted nonbinding case law to determine that something more than that is required. It is not. Plaintiffs also adequately pled that Mayer, Walker, and Queen misappropriated that trade secret because they acquired knowledge of the Proprietary Software during their Sherbrooke employment—while they were bound by their employment contracts—and then used that software to harm Sherbrooke's business. Plaintiffs were not required, as the trial court reasoned,

2

to plead their DTSA claim with any heightened particularity.  Since DTSA claims require only standard notice pleading under Rule 8, the trial court erred by concluding that Plaintiffs allegations were lacking.

This Court should reverse and permit the discovery process to play out. Despite their preliminary disadvantage in this litigation, Plaintiffs have alleged more than enough facts, in more than enough detail, at this stage of the case to establish the DTSA's basic elements.  Since Plaintiffs adequately pled that claim, the trial court also erred by and declining to exercise supplemental jurisdiction over Plaintiffs' other claims.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction because Plaintiffs asserted a claim under the DTSA, 18 U.S.C. § 1836, *et seq*., which arises under the laws of the United States.  28 U.S.C. § 1331.  The district court granted Defendants' Motion for Judgment on the Pleadings, and dismissed the action in full, on October 23, 2024. JA83 (the "Order").  Plaintiffs timely noticed their appeal on November 22, 2024. JA94.  Thus, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

I.     Did the district court err in granting judgment on the pleadings in favor of Defendants when Plaintiffs plausibly alleged that Plaintiffs took commercially reasonable steps to maintain the confidentiality of its trade secrets?

3

II.     Did the district court err in granting judgment on the pleadings in favor of Defendants when Plaintiffs plausibly alleged misappropriation of its trade secrets?

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     Plaintiffs entrust day-to-day operations to Mayer, Walker, and Queen.

Sherbrooke is a captive insurance company that insures nursing facilities nationwide.[1]   JA9-10.   Goldner is the majority shareholder and sole director of Sherbrooke.   JA12.   Mayer and Queen are minority shareholders and former directors or officers of Sherbrooke.   JA12, JA20.   Walker is the company's former Chief Technology Officer.   JA17.   Each of them served as either directors or officers until 2023, and each signed an employment contract.   JA13-15, JA17.

Each employment contract included strict confidentiality, non-solicitation, non-disparagement, and invention provisions.   JA13-15.   The confidentiality provision stated that employees shall not "disclose Confidential Information to any Person or use or exploit Confidential Information for any purpose other than for the benefit of the [Sherbrooke]."   JA13.   It included only four narrow exceptions to that

---

[1] Since all the facts set out in this brief are taken from the allegations in the Complaint, the Court must accept them as true at this stage. *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 591 (4th Cir. 2004) ("In reviewing an award of judgment on the pleadings, we assume the facts alleged in the relevant pleadings to be true, and we draw all reasonable inferences therefrom.").

mandate: (a) disclosure with the consent of Sherbrooke; (b) disclosure by an employee who already knew the confidential information before working at Sherbrooke; (c) disclosure to a person that already knew the confidential information; and (d) disclosure required by legal process. JA13. The contract separately stated that "any invention, idea, design, process, system, procedure, improvement, development or discovery" created by an employee during employment at Sherbrooke "shall become the sole and exclusive property of [Sherbrooke]." JA14-15.

**B.      Mayer, Walker, and Queen manage Sherbrooke for their own gain.**

Throughout their tenure, Mayer, Queen, and Walker exerted complete control over Sherbrooke's day-to-day operations. JA13. They were solely responsible for maintaining Sherbrooke's corporate assets and operations, supervising Sherbrooke's approved captive manager, Management Services International ("MSI"), as it administered and managed Sherbrooke's insurance contracts, supervising Sherbrooke's employees, and maintaining corporate records. JA13, JA15. Eventually, Mayer, Queen, and Walker used their complete control over Sherbrooke to modify Sherbrooke's fundamental corporate features, including removing MSI as the captive manager and installing their own entity, Defendant Helios Risk Solutions, LLC, to serve as captive manager. They did so without NCDOI approval and to enrich themselves by charging exorbitant and excessive fees. JA16.

### C.    Sherbrooke and Goldner discover Mayer, Walker, and Queen's malfeasance.

In April 2023, Walker resigned from Sherbrooke.  JA19.  Around December 2023, Goldner became aware that Mayer, Queen, and Walker had severely mismanaged Sherbrooke, flaunted NCDOI requirements, embezzled corporate funds, misused and misappropriated confidential corporate information and software, and began substantial preparations to create a competing insurance entity. JA19.  For example, their decision to contract with Helios, which the trio owned and operated, exceeded their authority under Sherbrooke's by-laws, required Sherbrooke to pay five times the standard services rate, required Sherbrooke to pay unconscionable damages to terminate, and did not comply with governing insurance regulations.  JA16.

Also, while employed by Sherbrooke, Mayer, Queen, and Walker formed a competing entity—catalyzed by the theft of the Proprietary Software—to directly compete with Sherbrooke by providing insurance policies to nursing homes and other similar businesses.  JA18-19.  The Proprietary Software was designed by Sherbrooke at considerable expense to "incorporate and utilize medical records to project and predict risk values in pricing individual covered incidents more effectively" and "accurately price insurance contracts for both existing and potential customers."    JA17-18.    It therefore qualified as an "Invention" under the employment contracts' invention provision.  JA14-15 (covering "any invention,

idea, design, process, system, procedure, improvement, development or discovery"
created by a Sherbrooke employee during employment).  Since the Proprietary
Software gave the company a competitive advantage, it was closely guarded by
Sherbrooke (indeed, after Mayer, Queen, and Walker stole it, Sherbrooke demanded
its return).  (*See* JA13, JA17-18, JA29-30).  It therefore qualified as confidential
information under the contract's confidentiality provision.  JA13.

Mayer, Queen, and Walker also capitalized on Sherbrooke's goodwill and
reputation to prop up their competing entity by falsely representing that it is
associated with Sherbrooke and its corporate family.  JA19.

### D.    Mayer, Walker, and Queen defy Sherbrooke's shareholders and board and prevent Plaintiffs' redress.

When Goldner discovered Mayer, Queen, and Walker's malfeasance, Goldner
removed Mayer and Queen as directors and officers of Sherbrooke.  JA20.  Their
removal was valid under Sherbrooke's by-laws and took place at a Special
Shareholder Meeting in January 2024.  Following that meeting, Sherbrooke's board
of directors voted to terminate Sherbrooke's relationship with Helios.  JA20.

Despite these valid and necessary corporate actions, Mayer, Queen, and
Walker refused to relinquish control over the company's accounts and assets.  JA21.
They precluded Goldner from accessing Sherbrooke's bank accounts and prevented
him from responsibly monitoring the company's assets.  JA21.

When Goldner demanded that Defendants desist their unlawful behavior, Defendants contacted North Carolina insurance regulators to smear Goldner by blaming him for Sherbrooke's collapse and failure, the syphoning of corporate funds from Sherbrooke through embezzlement or surreptitious and improper means, improper termination of directors and officers, the failure to keep adequate corporate records, and the failure to comply with necessary regulations pertaining to captive insurance companies in North Carolina. JA22. Each of these claims is false and each of them has gravely injured Goldner and Sherbrooke's reputation. JA22. Plaintiff filed this suit to right those wrongs.

## II.    Procedural History

Plaintiffs sued Defendants, asserting fourteen causes of action related to Defendants' corporate malfeasance. JA23-37. Defendants filed their Answer and Affirmative Defenses, which they subsequently amended to assert counterclaims against Plaintiffs. JA13-15. Defendants then filed their Motion for Judgment on the Pleadings ("Motion"), asking the district court to enter judgment as a matter of law on eight of Plaintiffs' claims. JA15.

After a hearing, the trial court granted Defendants' Motion. JA19. It dismissed the Plaintiffs' DTSA claim—their sole federal claim—and declined to exercise supplemental jurisdiction over the remaining state-law claims. JA19. The trial court reasoned that Plaintiffs insufficiently pled that the Proprietary Software

8

was a trade secret under the DTSA because they had not taken reasonable efforts to ensure its security.  It also ruled that Plaintiffs failed to allege that Mayer, Walker, and Queen misappropriated the Proprietary Software because Plaintiffs did not plead with sufficient particularity that (1) the Proprietary Software was confidential information under their employment contracts or (2) that Mayer, Walker, and Queen "used" the Proprietary Software for unauthorized means under the DTSA.  After dismissing the DTSA claim for those reasons, the Court declined to exercise supplemental jurisdiction over the remining state-law claims.  This appeal followed.

## SUMMARY OF ARGUMENT

The Court should reverse the trial court's determination that Plaintiffs inadequately pled their DTSA claim because Plaintiffs alleged both the existence and the misappropriation of a trade secret.

Under the DTSA, confidential information is a trade secret so long as its owner makes reasonable efforts to maintain its secrecy.  Plaintiffs did exactly that by ensuring that Sherbrooke employees signed employment contracts that included the Confidentiality and Inventions Provisions.  Based only on a single nonbinding case, the trial court wrongly concluded that Plaintiffs needed to have done more.  But even that case, when read in context, supports Plaintiffs' position.  It never reaches the holding that the trial court seems to have ascribed to it, and the authority on which it relied is clear: even one secrecy measure can establish trade secret

protection under the DTSA so long as it qualifies as a reasonable effort. Requiring employees to sign contractual confidentiality protections clears that hurdle.

Trade secret misappropriation under the DTSA takes place when a defendant uses the trade secret of another without consent and with the knowledge that the trade secret was acquired subject to a duty to maintain its confidentiality. This case is a textbook example of DTSA trade secret misappropriation. Walker, Mayer, and Queen each agreed to keep the Proprietary Software confidential while working for Sherbrooke, then used the software to start a company in direct competition with Sherbrooke. The trial court's ruling to the contrary ignored several of Plaintiffs' allegations and neglected to review the complaint in the light most favorable to Plaintiffs or draw all reasonable inferences in their favor.

The trial court also confused the pleading standards applicable to the DTSA and its North Carolina counterpart, the North Carolina Trade Secret Protection Act ("NCTSPA"). While both statutes confer and enforce trade secret protection, they are not stand-ins for one another. The NCTSPA carries a heightened pleading standard that requires plaintiffs to allege with particularity both the existence and misappropriation of trade secrets. The DTSA does not. It requires nothing more than traditional notice pleading. Yet the trial court faulted Plaintiffs for pleading trade secret misappropriation without enough "factual enhancement" to survive Defendants' motion. Whether or not Plaintiffs' allegations are fulsome and

10

particular enough to state an NCTSPA claim matters not.  They satisfy Rule 8.

Plaintiffs' DTSA claim should therefore survive into discovery.  Because, as a result, federal question jurisdiction exists, the Court should also reverse the trial court's decision to decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

## STANDARD OF REVIEW

The Court reviews "the district court's grant of judgment on the pleadings . . . de novo."  *Williamson v. Prime Sports Mktg., LLC*, 101 F.4th 302, 309 (4th Cir. 2024) (citing *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002)).  The Court takes "all reasonable factual inferences in favor of [Plaintiffs], as the non-moving party."  *Id.*  "The same standard applies to a motion for judgment on the pleadings as to a motion to dismiss for failure to state a claim."  *Witherspoon v. State Emps.' Credit Union*, 733 F. Supp. 3d 446, 450 (E.D.N.C. 2024).

## ARGUMENT

The district court erred by concluding that Plaintiffs failed to state a DTSA claim.  "To state a claim under DTSA, a plaintiff must allege (1) the existence of a trade secret as defined in the statute; (2) a nexus between the secret and interstate or foreign commerce; and (3) misappropriation of such trade secret."  *Trans-Radial Sols., LLC v. Burlington Med., LLC*, No. 2:18-CV-656, 2019 WL 3557879, at *15

(E.D. Va. Aug. 5, 2019). The district court correctly held that "Plaintiffs have adequately identified the Proprietary Software with sufficient specificity insofar as they have described projecting and predicting risk as well as accurately pricing insurance contracts." JA88. But the court was incorrect that Plaintiffs failed to plausibly allege that: (1) Plaintiffs took reasonable efforts to maintain the secrecy of the Proprietary Software and (2) Defendants misappropriated the Proprietary Software. For the reasons set forth below, the Court should reverse the district court's holdings on both of those issues, reverse the court's decision to decline to exercise supplemental jurisdiction over the remaining state-law claims, and remand for further proceedings.

## I. Plaintiffs Plausibly Alleged That They Took Reasonable Efforts To Maintain The Proprietary Software's Secrecy.

The trial court incorrectly held that Plaintiffs failed to state a plausible DTSA claim because they did not show that they took reasonable efforts to maintain the Proprietary Software's secrecy. It reasoned that the confidentiality provision in Sherbrooke's employment contract was insufficient and that, in any event, Plaintiffs failed to plead that the Proprietary Software was confidential information in the first place. But the trial court overlooked Plaintiffs' plain allegations and misconstrued the case law that it cited.

12

**A.**    **Requiring employees to sign confidentiality agreements constitutes a reasonable effort to maintain secrecy.**

Under the DTSA, information is a trade secret if "the owner thereof has taken reasonable measures to keep such information secret," and "the information derives independent economic value, actual or potential, from not being generally known." 18 U.S.C. § 1839(3)(A)-(B); *see Trans-Radial Sols., LLC*, 2019 WL 3557879, at *16 (To receive trade secret protection, owners of information need only take "reasonable efforts" to "maintain secrecy.") (quoting *MicroStrategy Inc, v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 424–25 (E.D. Va. 2004)).

In this Circuit and others, requiring employees to sign confidentiality agreements qualifies as a reasonable effort to maintain the secrecy of proprietary information. *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (DTSA plaintiff took "steps to keep such information secret through security measures, restricting access to the source code, and *requiring confidentiality agreements from employees*.") (emphasis added); *Trans-Radial Sols., LLC*, 2019 WL 3557879, at *16 ("Restricting access to information, *implementing confidentiality agreements*, and providing physical barriers to access are all reasonable efforts.") (emphasis added); *see also, e.g., WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1322 (N.D. Fla. 2024) ("Reasonable measures to keep information secret can include the use of: . . . non-disclosure or confidentiality agreements[.]").

13

Plaintiff took exactly such measures here.  Walker, as Sherbrooke's Chief Technical Officer, was charged with designing and creating the Proprietary Software for Sherbrooke's benefit.  JA17.  As a condition of their employment, Walker, Mayer, and Queen each signed a Sherbrooke employment contract.  JA13.  That contract contained a section entitled "Confidentiality Provision," which prohibited Mayer, Walker, and Queen from "us[ing] or exploit[ing] Confidential Information for any purpose other than for the benefit of [Sherbrooke]" (subject to exceptions not applicable here).  JA13.  The trio then engaged in exactly the sort of conduct that the confidentiality provision guarded against: they stole the Proprietary Software and used it to start a new company to compete directly against Sherbrooke.  *See* JA17.

The existence of the confidentiality provision that Mayer, Walker, and Queen violated is enough to establish that Plaintiffs took reasonable efforts to maintain the Proprietary Software's secrecy.  *Hilb Grp. of New England, LLC v. Lavorgna*, No. 3:24-CV-462–HEH, 2024 WL 3234060, at *5 (E.D. Va. June 28, 2024) ("Plaintiff has shown that it took reasonable measures to keep this information secret by requiring . . . all of its employees, to sign confidentiality agreements.").  It is certainly enough to preclude a finding *as a matter of law* that these efforts were insufficient. Whether certain proprietary information constitutes a trade secret is ordinarily a *fact question* inappropriate for resolution before discovery.  *Tactical Rehab., Inc. v.*

14

*Youssef*, No. 2:24-CV-173, 2024 WL 4712696, at *11 (E.D. Va. Nov. 7, 2024) ("Determining whether a trade secret exists is generally a question of fact to be determined from the greater weight of the evidence.") (internal quotations omitted); *Elgin Separation Sols., LLC v. Dillon*, No. 2:23-CV-00440, 2024 WL 3553850, at *5 (S.D. W. Va. July 25, 2024) (same). The trial court disregarded that standard and concluded on its own, on the pleadings, that Sherbrooke's confidentiality provisions were insufficient to maintain the Proprietary Software's secrecy.

**B.    The trial court's reasoning to the contrary was flawed.**

Despite Plaintiffs' allegations and the case law described above, the trial court held that Plaintiffs (1) merely concluded (without sufficiently alleging) that Sherbrooke made reasonable efforts to keep the Proprietary Software secret and (2) failed to allege that Sherbrooke treated the Proprietary Software as "'confidential information' under the employment agreement" in the first place. JA89. Both determinations were incorrect.

1.    <u>Plaintiffs adequately alleged that Sherbrooke took commercially reasonable measures to keep the Proprietary Software secret.</u>

It is difficult to imagine how much more specifically Plaintiffs could have alleged that Sherbrooke required employees to sign confidentiality provisions, and that Mayer, Walker, and Queen each did so before misappropriating the Proprietary Software. As discussed above, those reasonable measures are enough to confer trade secret protection under the DTSA.

15

Yet the trial court ignored these allegations and held, under *Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115 (D. Md. 2020), that Plaintiffs' allegations were inadequate. The *Brightview* court determined that a plaintiff took reasonable efforts to maintain secrecy because it included a confidentiality policy in its employee handbook and restricted employee access to the information at issue. *Id.* at 130. From that holding, the trial court extrapolated a rule that DTSA plaintiffs must plead multiple reasonable efforts to maintain secrecy to receive trade secret protection. But *Brightview* held no such thing. While it concluded that the employer's confidentiality policy and access restriction satisfied the DTSA standard, it did not rule that a confidentiality policy alone is insufficient.

Indeed, the authority on which *Brightview* relied suggests the opposite. *Brightview* cited *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460, 480 (D. Md. 1999), for the proposition that "the plaintiff failed to take reasonable security measures because it gave its claimed trade secret business plan to third parties *without requiring them to execute a confidentiality agreement*." *Brightview*, 441 F. Supp. 3d at 130. And it cited *NaturaLawn of America, Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 399 (D. Md. 2007), for the proposition that "a franchisor took reasonable steps to keep its trade secret customer list secret, despite all franchisees having the list, because the franchise agreements provided for their return upon the end of the franchise relationship." *Brightview*, 441 F. Supp. 3d

16

at 131. *Motor City Bagels* and *NaturaLawn* each suggest that plaintiffs can satisfy the DTSA's reasonable efforts standard by implementing a single protective measure.

That rationale is consistent with decisions from around the Circuit, which hold that the existence of a confidentiality policy or agreement alone is enough to satisfy the DTSA's "reasonable efforts" standard. *Lavorgna*, 2024 WL 3234060, at *5; *Trans-Radial Sols., LLC*, 2019 WL 3557879, at *16 ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are *all* reasonable efforts.") (emphasis added).

The trial court was therefore incorrect that Sherbrooke's implementation of a confidentiality provision in its employment contract, even on its own, was inadequate under the DTSA.

> ### 2. Plaintiffs adequately alleged that Sherbrooke treated the Proprietary Software as confidential information.

The trial court also faulted Plaintiffs for failing to allege that "the Proprietary Software was treated as 'confidential information' under the employment agreement" and that "none of the exceptions to what employees must maintain as confidential applied." That ruling, however, is inconsistent with the Rule 12(c) standard of review and the Plaintiffs' clear allegations.

Because Plaintiffs appeal from an order granting judgment on the pleadings, the Court must "view the facts presented in the light most favorable" to them,

*Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019), and "draw all reasonable inferences" in their favor, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018).   Against that standard, Plaintiffs' allegations show that the Proprietary Software qualified as "confidential information" under the employment agreement and that none of the confidentiality provision's exceptions applied.

> ### *i.     The Proprietary Software qualified as confidential information.*

Plaintiffs alleged more than enough information about the Proprietary Software's confidentiality to allow the trial court to reasonably infer that the software fell within the confidentiality provision.   Sherbrooke hired Walker to develop the Proprietary Software for the "exclusive use of Sherbrooke" and its related entities.  JA17.  Sherbrooke spent over $1 million to develop the software, JA17, and informed Walker in his employment agreement that "any invention, idea, design, process, system, procedure, improvement, development or discovery . . . conceived, created, made or developed by" him during his employment "shall become the sole and exclusive property of [Sherbrooke]," JA14-15.

The Proprietary Software gave Sherbrooke several advantages over its competition, including the ability to use "medical records to project and predict risk values in pricing individual covered incidents more effectively" and "more accurately price insurance contracts for both existing and potential customers to

provide." JA18.  And, after they stole the Proprietary Software, Walker, Mayer, and Queen used it to stand up a separate company to compete directly with Sherbrooke. JA19.  Throughout the complaint, Plaintiffs also described the Proprietary Software as what it was: the confidential property of Sherbrooke.  *See, e.g.,* JA17-19.

Thus, contrary to the trial court's conclusion, Plaintiffs did not merely "alleg[e] that employees were generally subject to confidentiality provisions in an employment contract."  JA89.  They described the in-house development of the Proprietary Software, established its value to Sherbrooke, and detailed the contractual safeguards they implemented to keep the software behind closed doors. Those allegations, especially when viewed in the light most favorable to Plaintiffs, are enough to show that Sherbrooke treated the Proprietary Software as confidential.

ii.    *None of the exceptions in the confidentiality provision applied.*

The confidentiality provision states that otherwise confidential information may lose protection if: (a) Sherbrooke consented to its disclosure, (b) an employee knew of the confidential information before he acquired it during his Sherbrooke employment, (c) the person to whom the disclosure of otherwise confidential information was made already knew of the confidential information, or (d) disclosure the information is required by valid legal process.  JA13.  The complaint makes clear that none of these exceptions applies here.

19

Sherbrooke did not consent to Mayer, Walker, and Queen's disclosure of the Proprietary Software to parties outside of Sherbrooke or to its use for a competing venture. To the contrary, Plaintiffs alleged their unauthorized use constituted "theft and misappropriation of confidential and proprietary software technology." JA17. Sherbrooke has also "demanded" that Mayer, Walker, and Queen "cease and desist from utilizing" the Proprietary Software and "return . . . all stolen or misappropriated trade secrets." JA29-30.

Nor did Mayer, Walker, and Queen know of the Proprietary Software before they began their employment with Sherbrooke. Indeed, the software did not exist before Walker became Sherbrooke's CTO and began developing it. JA17.

To the extent that Mayer, Walker, and Queen disclosed the Proprietary Software to others at their competing company, those individuals could not have known about the software beforehand because Sherbrooke did not share the software outside of the company. JA18 ("This Proprietary Software is—and always has been—the confidential property of Sherbrooke. Sherbrooke has used all commercially reasonable measures to ensure that the Proprietary Software remains confidential and provides unique value to Sherbrooke.").

Finally, Mayer, Walker, and Queen misappropriated the Proprietary Software not because any legal process compelled them to, but because they chose to start a competing company. JA17.

While Plaintiffs did not explicitly allege in any single sentence that none of the confidentiality provisions exceptions applies, that reality is apparent from the allegations above.  Moreover, requiring Plaintiffs to allege facts that *did not* occur would be tantamount to requiring them to plead a negative, which courts nationwide are loath to do.  *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Pilot Life Ins. Co.,* No. C-90-29-G, 1991 WL 210855, at *13 (M.D.N.C. Aug. 6, 1991) (holding that plaintiff need not "disclaim" jurisdictional bars); *Paone v. Broadcom Corp.*, No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *13 (E.D.N.Y. Aug. 19, 2015) ("It is, of course, difficult to plead  a negative with any detail."); *Vision Bank v. Tannin*, Inc., No. CV 11-00051-CB-B, 2011 WL 13273499, at *1 (S.D. Ala. May 16, 2011) ("Plaintiff need not affirmatively plead a negative" under Rule 8(a)); *see also Creamer v. Schwartz*, No. 2:16-CV-201, 2016 WL 5121812, at *2 (W.D. Pa. Sept. 21, 2016) (holding that "[m]alicious prosecution claims are *unique* in that a plaintiff is required to plead  a negative") (emphasis added, internal quotations omitted).

Plaintiffs' allegations were more than adequate to show that the Proprietary Software was confidential information, both under the DTSA and the employment contract.  As a result, the court erred by dismissing Plaintiffs' DTSA claim for failing to adequately plead that they took reasonable efforts to maintain the secrecy of confidential information.

## II. Plaintiffs Plausibly Alleged That Defendants Misappropriated Plaintiffs' Proprietary Software.

The trial court also held that Plaintiffs did "not plausibly allege[] misappropriation of their trade secret" because they merely stated that Mayer, Walker, and Queen "acquired or used" the Proprietary Software without any "factual enhancement." JA89-90. That ruling, once again, overlooks Plaintiffs' allegations and misunderstands the pleading standard applicable to DTSA claims.

### A. Plaintiffs alleged that Mayer, Walker, and Queen misappropriated the Proprietary Software under the DTSA.

Under the DTSA, "misappropriation" is defined, in relevant part, as (i) the "use of a trade secret of another (ii) without express or implied consent by a person who," at the time of the use, (iii) "knew or had reason to know that the knowledge of the trade secret was" "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5)(B)(ii). Plaintiffs have adequately alleged misappropriation under that standard.

For the reasons discussed above, the Proprietary Software constitutes a trade secret under the DTSA. *See supra* pp. 12-21. Mayer, Walker, and Queen each are indisputably alleged to have "used" the Proprietary Software when they founded a company to compete with Sherbrooke and employed the software for that company's benefit. JA19. And they did so without Plaintiffs' consent. JA29-30.

Finally, Mayer, Walker, and Queen also each knew, or at least had reason to know, that knowledge of the Proprietary Software was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret. Their employment contracts made clear that "*any* invention, idea, design, process, system, procedure, improvement, development or discovery" based on confidential information that they "conceived, created, made or developed . . . alone or with others" during the term of their employment "shall become the sole and exclusive property of [Sherbrooke]." JA14-15 (emphasis added). That provision, combined with the confidentiality provision's prohibition on using or disclosing confidential information, created "circumstances giving rise to a duty" for Mayer, Walker, and Queen "to maintain the secrecy of the" Proprietary Software. 18 U.S.C. § 1839(5)(B)(ii).

The trial court simply ignored these allegations and erred by reducing Plaintiffs' claim to the bare conclusion that Mayer, Walker, and Queen misappropriated the Proprietary Software.

## B. The trial court granted Defendants' motion using the wrong pleading standard.

The trial court granted the Motion on the ground that Plaintiffs "pleaded no factual enhancement to support their claim that any of the defendants are using the Proprietary Software." JA89-90. In doing so, the court held Plaintiffs to a heightened pleading standard that the DTSA does not require.

23

Rule 8's familiar notice-pleading standard applies to DTSA claims. *See Heska Corp. v. Qorvo US, Inc.*, No. 1:19CV1108, 2020 WL 5821078, at *7 (M.D.N.C. Sept. 30, 2020). Under that standard, a plaintiff need only allege a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). The NCTSPA, on the other hand, carries a heightened pleading standard that requires plaintiffs to "identify [the] trade secret with sufficient particularity" and "set forth with sufficient specificity the acts by which the alleged misappropriation occurred." *Heska*, 2020 WL 5821078, at *8. That distinction matters because the DTSA's "definition of misappropriation is modeled on the Uniform Trade Secrets Act, versions of which have been adopted by 48 states." *Id.* at *4. Because North Carolina is one of the two states that *has not* adopted the UTSA, courts analyze DTSA and NCTSPA separately. *See id.*

Here, however, the trial court analytically collapsed the two statutes. It dismissed Plaintiffs' *DTSA* claim because, according to the court, Plaintiffs did not plead misappropriation with enough particularity to meet the *NCTSPA's* stricter pleading standard. That error is evident from the trial court's citations to *Heska* and *VRX USA, LLC v. VRX Ventures, Ltd.*, No. 3:20CV409-GCM, 2020 WL 7229672, at *8 (W.D.N.C. Dec. 8, 2020). *VRX Ventures* concerned only an NCTSPA claim—not a DTSA claim. While the trial court reasoned, based on *VRX Ventures*, that the

NCTSPA is "substantially similar" to the DTSA, *VRX Ventures* says no such thing. JA89-90.

The court also cited *Heska* to highlight the "similarit[ies]" between the DTSA and NCTSPA. JA89-90. But the similarities that *Heska* focused on, such as the statutes' definition of a trade secret and the fact that each statute gives plaintiffs a right of action for trade secret misappropriation, are unimportant here. What matters here is that the *Heska* explicitly rejected the argument that the DTSA "require[es] particularity above notice pleading." 2020 WL 5821078, at *7-8.

Read in full, *Heska* supports Plaintiffs' position. There, the plaintiff alleged that a defendant misappropriated trade secrets that it acquired while the two companies worked together to develop a veterinary medical instrument. *Id.* at *1. In ruling that the plaintiff adequately alleged that the defendant acquired the information "through improper means," the court held that the plaintiff satisfied the DTSA's pleading standard by asserting that the defendant "acquired information and assets RDI did not have authority to transfer" while it had knowledge of the parties' confidentiality agreement. *Id*. at *8. Plaintiffs have alleged Mayer, Walker, and Queen's acquisition and improper use of the Proprietary Software to compete with Sherbrooke with *at least* that level of detail.

Thus, even under the case law that the trial court cited, the heightened NCTSPA pleading standard does not apply to Plaintiffs' DTSA claim. Since the

25

trial court misapplied the law and overlooked Plaintiffs' well-pled allegations, the Court should reverse the entry of judgment on the pleadings.

**III.    The Court Should Reverse The Trial Court's Refusal To Exercise Supplemental Jurisdiction Over Plaintiffs' State-Law Claims.**

After wrongly determining that Plaintiffs inadequately pled their DTSA claim, the trial court declined to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and dismissed the entire action.  JA90; 28 U.S.C. § 1367(c)(3) (providing that a district court can decline to exercise supplemental jurisdiction over a state-law claim when it "has dismissed all claims over which it has original jurisdiction.").

As addressed above, the Court should reverse the trial court's decision to dismiss Plaintiffs' DTSA claim.  Doing so would mean that Plaintiffs still have a live federal claim "over which [the district court] has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Therefore, if the Court reverses the ruling below on the DTSA claim it should also reverse the trial court's decision to decline to exercise supplemental jurisdiction over the remaining claims.

## CONCLUSION

For these reasons, the Court should reverse the district court's entry of judgment on the pleadings and remand for further proceedings consistent with this Court's ruling.

Dated: March 13, 2025

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500
Raleigh, NC 27601
T: (919) 755-6688
F: (919) 755-6588
jellis@mcguirewoods.com

Respectfully submitted,

*/s/ Brian A. Kahn*
Brian A. Kahn
Zachary L. McCamey
Dylan M. Bensinger
Elisabeth P. Briand
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
T: (704) 343-2351
F: (704) 444-8869
bkahn@mcguirewoods.com

*Counsel for Appellants Samuel Sherbrooke Corporate, LTD and Samuel Goldner*

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully submit that, given the complexity of the issues presented and serious consequence at stake for Appellants, oral argument would be helpful to the disposition of this appeal.  *See* 4th Cir. Local Rule 34(a).

*/s/ Brian A. Kahn*
Brian A. Kahn

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,641 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced Times New Roman typeface using Microsoft Word, in 14-point size.

*/s/ Brian A. Kahn*
Brian A. Kahn

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2025, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the system.

*/s/ Brian A. Kahn*
Brian A. Kahn